UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:19-CV-00050-GNS-RSE

FADI FAKHRI as administrator of the estate of
Raad Fakhri Salman; and
QADERYIA FADAAM                                          PLAINTIFFS

v.

LOUISVILLE-JEFFERSON COUNTY
METROPOLITAN GOVERNMENT;
LOUISVILLE METRO POLICE DEPARTMENT; and
BRANDON HOGAN                                            DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Brandon Hogan's Motion for Summary

Judgment (DN 16) and Plaintiffs' Objection to the Magistrate Judge's Discovery Ruling (DN 28).

The motion and objection are now ripe for adjudication.  For the reasons that follow, the motion

is **GRANTED** and the objection is **OVERRULED**.

## I.    BACKGROUND

This action arises out of the July 5, 2018, fatal shooting of decedent Raad Fakhri Salman

("Salman") by Defendant Brandon Hogan ("Hogan"), an officer with the Louisville Metro Police

Department, while Hogan was responding to a dispatch report that Salman was threatening his

wife, Plaintiff Qaderyia Fadaam ("Fadaam"), with a knife.  (Compl. ¶¶ 13, 17, 25, 27, 38, DN 1).[1]

Plaintiffs brought this action against Hogan[2] asserting:  (1) a claim under 42 U.S.C. § 1983 for

excessive force; (2) a state law claim for "battery causing wrongful death and loss of

---

[1] Hogan states that, for the purpose of this motion, he does not dispute most of the facts as alleged
in the Complaint.  (Def.'s Mem. Supp. Mot. Summ. J. 1 n.1, DN 16-1).
[2] Plaintiffs also asserted causes of action against the other defendants in this case that have all since
been dismissed with prejudice.  (Compl. ¶¶ 59-99, 114-117; Mem. Op. & Order 11, DN 9).

consortium[;]" (3) a state law negligence claim; and (4) a state law claim for "intentional or negligent infliction of emotional distress[.]" (Compl. ¶¶ 46-58, 100-113).  All of these claims are asserted against Hogan in his individual capacity.  (Compl. ¶¶ 46-58, 100-113).  Hogan has since moved for summary judgment on all of Plaintiffs' claims against him.  (Def.'s Mot. Summ. J. 1, DN 16).  Plaintiffs have also objected to a discovery ruling from the Magistrate Judge.  (Pls.' Obj. 1-3, DN 28).

## II.  JURISDICTION

The Court has federal question jurisdiction over Plaintiffs' Section 1983 claims, and supplemental jurisdiction is afforded over Plaintiffs' state law claims.  *See* 28 U.S.C. §§ 1331, 1367(a).

## III.  STANDARD OF REVIEW

In ruling on a motion for summary judgment, the Court must determine whether there is any genuine issue of material fact that would preclude entry of judgment for the moving party as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of stating the basis for the motion and identifying the evidence demonstrating an absence of a genuine dispute of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  If the moving party satisfies its burden, the nonmoving party must then produce specific evidence proving the existence of a genuine dispute of fact for trial.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

While the Court must view the evidence in the light most favorable for the nonmoving party, the nonmoving party must do more than merely show the existence of some "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted).  Rather, the nonmoving party must present facts proving that a

genuine factual dispute exists by "citing to particular parts of the materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1).  "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient" to overcome summary judgment. *Anderson*, 477 U.S. at 252.

### IV.    DISCUSSION

Generally, when both federal and state law claims are before a federal court, a federal court is to apply federal law to the plaintiff's federal law claims and state substantive law to the plaintiff's state law claims.  *Super Sulky, Inc. v. U.S. Trotting Ass'n*, 174 F.3d 733, 737, 741 (6th Cir. 1999) (citations omitted).

### A.    Section 1983 Excessive Force Claim

Plaintiffs first assert a Section 1983 claim for excessive force and identify the Fourth and Fourteenth Amendments as the constitutional amendments underlying their claim.[3]  (Compl. 10). The U.S. Supreme Court has made clear, however, that "all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach."  *Graham v. Connor*, 490 U.S. 386, 395 (1989).  In other words, Plaintiffs' excessive force claim, which arises from the seizure of Salman, should be analyzed under the rubric of the Fourth Amendment and not the Fourteenth Amendment's Due Process Clause.

Plaintiffs do not refute this conclusion, but rather assert for the first time in this litigation that their Section 1983 claim includes an allegation of the violation of the Fourteenth

_____

[3] Plaintiffs have conceded that their fleeting reference to the Eighth Amendment in their Complaint does not present a viable cause of action for violation of that amendment.  (Pls.' Resp. Def.'s Mot. Summ. J. 4, DN 18-1).

Amendment's Equal Protection Clause.  (Pls.' Resp. Def.'s Mot. Summ. J. 4-5).  Specifically, Plaintiffs assert that Hogan violated the Equal Protection Clause by discriminating against Salman because of Salman's race—the allegation appears to be that Hogan is quicker to shoot non-white individuals versus white individuals.  (Pls.' Resp. Def.'s Mot. Summ. J. 4-5).  The problem with Plaintiffs' argument here is that this is the first time in the entirety of this litigation that Plaintiffs have specifically asserted an Equal Protection claim.  As Hogan notes, there is absolutely nothing in Plaintiffs' Complaint or in any subsequent filings that would put Hogan on notice of having to defend against an Equal Protection claim.  (Def.'s Reply Mot. Summ. J. 5-6, DN 24); *see Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 787-89 (6th Cir. 2005) (affirming the district court's refusal to consider a new claim asserted for the first time in a response to a motion for summary judgment because plaintiff "advanced [a] new claim[] 'that w[as] never pled[]'" and because "there was 'nothing in [plaintiff's] Complaint to put Defendants on notice' of [plaintiff's] . . . claim."); *see also Edwards v. Niles Sales & Serv., Inc.*, 439 F. Supp. 2d 1202, 1224-25 (S.D. Fla. 2006), *overruled on other grounds by Lewis v. City of Union City*, 918 F.3d 1213, 1217-18 (11th Cir. 2019) (holding that plaintiff was precluded from asserting new additional grounds for a claim in a response to a motion for summary judgment when those grounds were not contained within the complaint).  Because Plaintiffs never pleaded claims under the Fourteenth Amendment, their Section 1983 excessive force claim will be analyzed under the rubric of the Fourth Amendment rather than the Fourteenth Amendment.

Hogan contends that he is protected by qualified immunity from this claim.  (Def.'s Mem. Supp. Mot. Summ. J. 4-8).  Although Section 1983 "provides 'a vehicle for a plaintiff to obtain damages for violations of the Constitution or a federal statute[,]' . . . the law provides government officials with qualified immunity from § 1983 claims." *Casey v. Rouse*, No. 7:17-145-KKC-EBA,

2020 WL 1236306, at *2 (E.D. Ky. Mar. 13, 2020) (quoting *Boler v. Earley*, 865 F.3d 391, 401 (6th Cir. 2017)).   "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted).   "Defendants bear the initial burden of coming forward with facts to suggest that they were acting within the scope of their discretionary authority during the incident in question."  *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1095 (6th Cir. 1992) (citation omitted).   "However, a plaintiff has the burden of proving that the defendant is not entitled to qualified immunity and must show that the right at issue is clearly established."  *Casey*, 2020 WL 1236306, at *2 (citing *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009)).

> As the Sixth Circuit has explained:

> [T]he plaintiff must effectively pass two hurdles when facing a defendant on summary judgment who claims qualified immunity.  First, the allegations must state a claim of violation of clearly established law.  Second, the plaintiff must present evidence sufficient to create a genuine issue as to whether the defendant in fact committed those acts.

*Russo v. City of Cincinnati*, 953 F.2d 1036, 1043 (6th Cir. 1992) (internal quotation marks omitted) (citations omitted).   "Claims of excessive force are analyzed under an objective-reasonableness standard, which depends on the facts and circumstance of each case viewed from the perspective of a reasonable officer on the scene."  *Miller v. Sanilac Cty.*, 606 F.3d 240, 251 (6th Cir. 2010) (citation omitted).   "[T]he use of deadly force is only constitutionally reasonable if 'the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'"  *Sample v. Bailey*, 409 F.3d 689, 696-97 (6th Cir. 2005) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)).   The Sixth Circuit "ha[s] upheld the use of deadly force by a

police officer when the factual situation revealed a perceived serious threat of physical harm to the officer or others in the area from the perspective of a reasonable officer."  *Id*. at 697 (citing *Boyd v. Baeppler*, 215 F.3d 594, 604 (6th Cir. 2000); *Rhodes v. McDannel*, 945 F.2d 117, 120 (6th Cir. 1991)).

Naturally, the parties dispute the reasonableness of Hogan's use of deadly force against Salman and the clarity of the law in defining such reasonableness.  (Def.'s Mem. Supp. Mot. Summ. J. 4-8; Pls.' Resp. Def.'s Mot. Summ. J. 5-12).  The record contains the statements of five individuals:  (1) witness and Salman and Fadaam's apartment complex property manager Jennifer Johnson ("Johnson"); (2) witness Jason Hart ("Hart"); (3) witness Henrietta Kelly ("Kelly"); (4) Fadaam; and (5) Hogan.  (Def.'s Mot. Summ. J. Ex. 2, at 3, 10-11, DN 16-3 [hereinafter Johnson Interview]; Conventional Filing Ex. 2, DN 20 [hereinafter Hart Interview]; Conventional Filing Ex. 1, DN 20 [hereinafter Kelly Interview]; Convention Filing Ex. 4, DN 20 [hereinafter Fadaam Interview]; Conventional Filing Ex. 3, DN 20 [hereinafter Hogan Interview]).  All statements were taken by the Louisville Metro Police Department's Public Integrity Unit on July 5, 2018, the day of the incident,[4] except for Hogan's, which was taken on July 9.[5]  (Johnson Interview 1; Kelly

---

[4] Although the record states that Fadaam's interview was taken on "January" 5, 2018 this is obviously a mistake as the incident took place on July 5, 2018.  (Fadaam Interview 0:08-0:10; Def.'s Mot. Summ. J. Ex. 6, at 1, DN 16-6).

[5] Hogan filed in the record and relied upon statements from Johnson, Hart, and Fadaam in support of his motion for summary judgment, while Plaintiffs' filed into the record and relied upon statements from Hart, Kelly, Fadaam, and Hogan.  (Def.'s Mem. Supp. Mot. Summ. J. 2, 13; Def.'s Mot. Summ. J. Ex. 2, DN 16-3; Def.'s Mot. Summ. J. Ex 3, DN 16-4; Def.'s Mot. Summ. J. Ex 6, DN 16-7; Pls.' Resp Def.'s Mot. Summ. J. 2-3, 7-9; Pls.' Resp. Def.'s Mot. Summ. J. Ex. 1, DNs 18-2 & 20).  All of the witnesses' statements are sworn to, except for Hogan's, there being no indication that Hogan ever swore to the statement he gave during his interview.  (Johnson Interview 3; Hart Interview 2:08-2:51; Kelly Interview 3:02-3:43; Fadaam Interview 5:40-8:03).  Sixth Circuit precedent dictates that statements taken in interviews with police cannot be relied upon by the Court at the summary judgment stage unless those statements are sworn to.  *See, e.g.*, *Purdy v. Newland*, 39 F.3d 1182, 1994 WL 601341, at *1 n.1 (6th Cir. 1994) ("It is true that plaintiff attached to its brief in opposition to defendants' summary judgment motion a transcript of a private

6

Interview 0:01-0:35; Hart Interview 0:01-0:30; Hogan Interview 0:01-0:59; Fadaam Interview 0:01-0:58).

Salman suffered from paranoia, specifically, the feeling that everyone was after him, would hurt him, or would steal from him. (Fadaam Interview 8:54-9:01, 9:28-9:42). On the morning of July 5, 2018, Salman and Fadaam were in their apartment when Salman told Fadaam that he was going to call the police so they could take him to jail. (Compl. ¶ 17; Fadaam Interview 13:02-13:11). Salman told Fadaam to call 911 and tell the responder that if the police did not come in 20 minutes Salman would kill Fadaam. (Fadaam Interview 14:11-14:27). Salman then told Fadaam that, if the police did not come in 15 to 20 minutes, he was going to kill her, to which Fadaam responded that she did not deserve to die. (Fadaam Interview 15:35-15:43). Salman threatened Fadaam with a kitchen knife. (Fadaam Interview 16:28-16:36; 20:16-21:42; Johnson

---

investigator's unsworn 'interviews' of four witnesses to the incident in the parking lot. . . . Fed. R. Civ. P. 56(e) requires statements such as these 'interviews' to be sworn in order to be considered by the court."); *Cabaniss ex rel. Estate of Cabaniss v. City of Riverside*, 497 F. Supp. 2d 862, 876 (S.D. Ohio 2006) ("[T]he transcript of the [police] interview of [a witness] is inadmissible hearsay. Moreover, the transcript of the interview of Fugate cannot be considered the functional equivalent of an affidavit or deposition, since there is no indication that he has been sworn before being interviewed."); *Jones v. Graley*, No. 2:05-cv-773, 2007 WL 9728902, at *1 (S.D. Ohio June 25, 2007) ("[Witness's] . . . sworn statement that was made to the Reynoldsburg Division of Police is admissible and can be considered by the Court."). This authority, therefore, dictates that Johnson, Kelly, Hart, and Fadaam's sworn statements to police can be considered at this time. As for Hogan's unsworn statements to police, not only have Plaintiffs not objected to the Court's consideration of Hogan's statements at this stage, but Plaintiffs themselves submitted and relied upon Hogan's statements in purported support of their position. *See Greenleaf's Lessee v. Birth*, 30 U.S. 132, 135 (1831) ("In the ordinary course of things the party offering evidence is understood to wave any objection to its competency as proof. It is not competent for a party to insist upon the effect of one part of the papers constituting his own evidence, without giving the other party the benefit of the other facts contained in the same paper."); *Brown v. White's Ferry, Inc.*, 280 F.R.D. 238, 243 (D. Md. 2012) ("[A] party waives any objection to the admissibility of evidence on summary judgment by offering that evidence in support of its own motion." (citing *Capobianco v. City of N.Y.*, 422 F.3d 47, 55 (2d Cir. 2005); *Motor Club of Am. Co. v. Hanifi*, 145 F.3d 170, 175 (4th Cir. 1998)). Plaintiffs submission of and reliance upon Hogan's statements to support their position indicates that such statements, in their entirety, may be considered on Hogan's motion for summary judgment.

Interview 17-18; Hart Interview 26:58-27:45; Kelly Interview 12:07-12:27; Hogan Interview 9:47-9:50, 10:30-10:34, 21:08-21:29).

Fadaam ran out the door of the apartment and fell; Salman caught up to her and grabbed her by the hair.  (Fadaam Interview 18:58-19:04).  Fadaam was screaming for help as Salman dragged her by the hair with the knife in his hand.  (Fadaam Interview 19:04-19:10; Kelly Interview 4:55-5:06, 6:02-6:08; Hart Interview 3:30-4:05, 8:28-8:46).  Two witnesses—Hart and Kelly—heard Fadaam's screams and decided to intervene.  (Hart Interview 3:30-4:05; Kelly Interview 4:40-4:55).  Hart tried to calm Salman down and was weighing whether he should hit Salman or tackle him because "you could see it in [Salman's] eyes" and gestures that Salman was going to stab Fadaam.  (Hart Interview (Hart Interview 4:05-4:29; 5:03-5:16).  At one point, Salman prevented Hart from helping Fadaam by threatening Hart with the knife.  (Hart Interview 24:00-24:19).

Kelly went to the apartment complex office and told the property manager, Johnson, that Salman was attacking Fadaam.  (Kelly Interview 5:15-5:45; Johnson Interview 4).  Johnson ran out and saw that Salman had his hand wrapped in Fadaam's hair, holding a knife to Fadaam's throat with his foot on her knee, stomping on her kneecap, which Hart could tell was hurting Fadaam.  (Johnson Interview 4, 14-15; Kelly Interview 7:06-7:20; Hart Interview 6:45-7:16).  Hart noted that Fadaam was scared and "freaked out[.]" (Hart Interview 7:38-7:44).  Salman threatened to use the knife on Fadaam and Hart believed Salman was going to use the knife on Fadaam.  (Hart Interview 9:39-10:20).  Salman also pointed the knife at Hart a couple of times.  (Hart Interview 12:29-12:40).  Every time Fadaam would move Salman would swing the knife at her.  (Johnson Interview 19).  Kelly and the property manager both called 911.  (Kelly Interview 6:34-7:06).  Fadaam screamed and reached out for Hart and Kelly, and Kelly begged Salman to let Fadaam go.

(Kelly Interview 6:08-6:32).   Fadaam kept reaching out to Kelly but Salman was holding Fadaam back and holding Kelly at bay with the knife.  (Kelly Interview 11:42-12:06).

Throughout this incident, Salman himself called 911 and spoke with a dispatcher.  Upon realizing that Salman was primarily speaking Arabic, translators were brought in on the call to ascertain what Salman was saying.  (Compl. ¶¶ 17-24).  The dispatcher's report reflects that Salman was threatening to kill and torture Fadaam if the police did not come in 20 minutes. (Compl. ¶ 25).  The report also notes Johnson's call to 911 telling the dispatcher that Salman was threatening Fadaam with a knife.  (Compl. ¶ 27).

Meanwhile, Hogan heard over the police radio that a man was holding his wife at knifepoint.  (Hogan Interview 7:06-7:30).   Hogan retrieved his rifle and loaded it before proceeding to the location of the incident.  (Hogan Interview 7:34-7:40).  As he approached the location, Hogan received an update that if police did not show up in 20 minutes, the man would kill his wife.  (Hogan Interview 8:23-8:31).

As Hogan arrived at the location, the witnesses flagged him down.  (Hogan Interview 9:00-9:12).  Hogan parked his vehicle, exited it, and grabbed his rifle.  (Hogan Interview 9:30-9:40). Although Hogan arrived in an undercover car and did not identify himself to Salman, Hart stated that Hogan was "clearly identifiable" as a police officer.  (Hart Interview 14:18-14:22, 30:23-31:28; Hogan Interview 25:52-26:02).   Hogan was wearing his "standard everyday SWAT uniform" including boots, green pants, a black t-shirt with a Louisville Metro SWAT crest on the front and "Louisville Metro" on the back, and a SWAT vest containing ammunition, handcuffs, a medical pouch, a light, and a big white/green "POLICE" patch on both the front and back of the vest.  (Hogan Interview 2:16-2:56, 19:30-19:59).

Fadaam was sitting on the ground but her face was hidden from Hogan's view.   (Hogan Interview 10:22-10:30).   Although Hogan did not see Salman physically restraining Fadaam, Salman was standing "over the top" of Fadaam, holding the knife and making gestures with it. (Hogan Interview 9:47-9:50, 10:30-10:34, 21:08-21:29, 24:02-24:20; Hart Interview 14:53-15:16). Kelly stated that Salman had the knife in his hand and "was ready to do [Fadaam] harm" when Hart arrived on the scene.   (Hart Interview 14:53-15:16; Kelly Interview 14:22-14:45, 15:32-15:35).   Hart indicated that Salman was still holding Fadaam by her hair and standing on her kneecaps at this point.   (Hart Interview 32:24-33:15).

Fadaam stated that when Hogan arrived at the scene, Salman had let go of her hair because he had the knife in one hand and a cell phone in the other and that Salman was not stomping on her knees.   (Fadaam Interview 27:20-27:30, 28:28-28:32).   Fadaam also stated that although Salman threatened her with the knife in the apartment, he did not threaten her with the knife outside, although she acknowledged that Salman was standing in close proximity to her.   (Fadaam Interview 29:08-29:17, 36:30-38:08).   Hogan noted that Salman did not verbalize any threats to either him or Fadaam and that Fadaam did not say anything but was distressed and appeared to be sobbing.   (Hogan Interview 21:42-23:20).

Hogan had been notified that Salman could not speak English.   (Hogan Interview 22:02-22:10).[6]   Hogan told Salman to drop the knife multiple times to which Salman did not comply. (Hogan Interview 10:08-10:21).   Initially, Salman turned around and shook his butt at Hogan "in a taunting manner" and then turned back around and stuck his tongue out at Hogan.   (Hogan Interview 10:34-10:47).   Hogan then advanced within ten to fifteen yards of Salman, and again

---

[6] According to Johnson, Salman "[spoke] enough English to tell you basic stuff."   (Johnson Interview 11).

10

told Salman to drop the knife.  (Hogan Interview 10:47-11:00).  Hogan did not point his rifle at Salman until he gave Salman a third warning to put the knife down.  (Hart Interview 31:30-31:57). Hart confirmed that Hogan told Salman to put the knife down and "the more [Hogan] said that . . . it seemed like [Salman] got more aggressive."  (Jason Hart Interview 6:00-6:10).  Salman raised the knife and after Hogan told him again to drop the knife, Salman made slashing motions toward Fadaam's face "inches" away from it.  (Brandon Hogan Interview 11:01-11:11, 23:27-23:53).  Hogan, believing Fadaam was in imminent danger, shot Salman twice.  (Hogan Interview 11:12-11:28).

Hogan estimated that everything happened around "ten seconds" from the time he exited his vehicle, and that he gave Salman between four to six warnings to drop the knife.  (Hogan Interview 12:15-12:19, 20:15-20:25).  Johnson heard Hogan tell Salman to put the knife down about two or three times.  (Johnson Interview 7-8, 21).  Hart commented that Hogan gave Salman four or five warnings to put the knife down or a "good 25 seconds" worth of warnings, which Salman ignored.  (Jason Hart Interview 15:16-15:35).  Hart noted that "[Hogan] gave [Salman] a chance . . . and it seemed like [Salman] may have stabbed [Fadaam] if [Hogan] didn't shoot [Salman].  I don't know what would have happened."  (Hart Interview 6:20-6:34).  Hart described Salman's actions during this incident as "kind of crazy."  (Hart Interview 16:34-16:37).  Kelly characterized Salman during this incident as "demonically possessed"  and stated that she feared for Fadaam's life.  (Kelly Interview 16:58-17:45, 18:16-18:56).  Fadaam was scared for her life during this incident and said she was "sure 100%" that Salman would have killed her had the police not arrived.  (Fadaam Interview 30:45-30:55; 32:50-33:10).

The facts discussed above support the reasonableness of Hogan's actions.  Dispatch related to Hogan that Salman was threatening to kill Fadaam with a knife.  (Brandon Hogan Interview

7:06-8:31).  When Hogan arrived at the scene, Salman was standing in close proximity to Fadaam, knife in hand.  (Hogan Interview 9:47-9:50, 10:30-10:34, 21:08-21:29, 24:02-24:20; Hart Interview 14:53-15:16; Kelly Interview 14:22-14:45, 15:32-15:35).  Hogan ordered Salman to drop the knife multiple times to which Salman did not comply.  (Hogan Interview 10:08-10:21; Johnson Interview 7-8, 21; Hart Interview 15:16-15:35).  The more Hogan told Salman to put the knife down, the more aggressive he became.  (Hart Interview 6:00-6:10).  Hogan then advanced to get closer to Salman, got within ten to fifteen yards of Salman, and again told Salman to drop the knife.  (Hogan Interview 10:34-11:00).  Hogan did not point his rifle at Salman until he gave Salman a third warning to put the knife down.  (Hart Interview 31:30-31:57).  Salman raised the knife and, after Hogan told him again to drop the knife, Salman made slashing motions near Fadaam's face just before Hogan shot Salman.  (Hogan Interview 11:01-11:28, 23:42-23:53).

Plaintiffs attempt to create factual disputes to preclude the grant of summary judgment in Hogan's favor.  The purported discrepancies, however, are immaterial or mischaracterizations of the record.  (Pls.' Resp. Def.'s Mot. Summ. J. 1-2).  First, although Plaintiffs question what information was actually relayed to dispatch by all the callers, it is undisputed that dispatch reported that Salman was threatening Fadaam with a knife.  (Pls.' Resp. Def.'s Mot. Summ. J. 1-2; Hogan Interview 7:06-8:31).  Second, Plaintiffs raise issues regarding how many officers arrived at the scene, when they arrived, and what their statements recounted.  (Pls.' Resp. Def.'s Mot. Summ. J. 2).  Other officers' statements are not in the record, however, and the only mention of other officers in the record relate to what a female officer did after Hogan shot Salman.  (Fadaam Interview 34:28-34:41).

Plaintiffs characterize Hogan's statement as a "simplified version" of the events that occurred and assert that his statement:

> [I]gnores important details, including that Ms. Fadaam was hidden behind a pillar
> and Mr. Salman was in front of it, that Mr. Salman was making non-threatening
> gestures to Hogan and can be heard through the [dispatch] recording stating
> "Police; No police" and "come help" at the time that Defendant Hogan arrived, he
> was at most pointing the knife towards his wife without moving towards her, and
> that Hogan shot Mr. Salman with an AR-15 rifle within seconds of arriving, while
> he was still over 30 feet from Mr. Salman.

(Pls.' Resp. Def.'s Mot. Summ. J. 3).   Plaintiffs cite Kelly's statement for the assertion that Fadaam

was hidden behind a pillar while Salman was in front of that pillar.   (Pls.' Resp. Def.'s Mot. Summ.

J. 3).   Yet, Plaintiffs cite to no specific time stamp for this purported statement and review of

Kelly's entire statement reveals no support for such an assertion—Kelly never mentions this

purported fact.   Plaintiffs point to no evidence of record to support their assertions regarding the

dispatch recording and that Salman was at most pointing the knife towards his wife without moving

towards her.   The dispatch recording is not a part of the record and Plaintiffs point to no specific

evidence of record to support their assertion regarding Salman's actions during this incident.   In

contrast, what Salman was doing when Hogan arrived was attested to by multiple witnesses—most

importantly, Salman's refusal to drop the knife while in close proximity to Fadaam and the slashing

motions he was making toward Fadaam with the knife.   (Hogan Interview 9:47-9:50, 10:08-10:21,

10:30-10:34, 11:01-11:11, 21:08-21:29, 23:42-23:53, 24:02-24:20; Hart Interview 6:00-6:10,

14:53-15:35; Kelly Interview 14:22-14:45, 15:32-15:35; Johnson Interview 7-8, 21).

     Plaintiffs also mischaracterize Fadaam's statement as relating that Salman was not in close

proximity to her when Hogan arrived.   (Pls.' Resp. Def.'s Mot. Summ. J. 7).   Plaintiffs state that

"Ms. Fadaam stated that when police arrived Mr. Salman was standing 'far from her[.]'"   (Pls.'

Resp. Def.'s Mot. Summ. J. 7).   Again, Plaintiffs do not cite Fadaam's statement with any

particularity to support this assertion.   More importantly, a review of Fadaam's statement reveals

that her actual statement was interpreted[7] as "*he was this* far from her" followed by a depiction of how close Salman and Fadaam were.  (Fadaam Interview 35:25-38:08).  The gestured depiction cannot be viewed because the record contains only an audio recording of the statements, but there is nothing in the record suggesting Salman was standing anywhere but in close proximity to Fadaam.

Plaintiffs again mischaracterize Hart's statement, asserting that Salman was not moving and that Hart "wasn't clear if he was pointing the knife at Ms. Fadaam."  (Pls.' Resp. Def.'s Mot. Summ. J. 7).  Hart, however, explicitly stated that the more Hogan told Salman to put the knife down "it seemed like [Salman] got more aggressive" and that "it seemed like [Salman] may have stabbed [Fadaam] if [Hogan] didn't shoot [Salman].  I don't know what would have happened." (Hart Interview 6:00-6:34).  Hart's statements in this regard refute Plaintiffs' claim that Hart indicated "Mr. Salman . . . wasn't making any verbal statements that indicated a state of anger." (Pls.' Resp. Def.'s Mot. Summ. J. 8).

Plaintiffs take issue with Hogan's perception of Salman's actions as "taunting."  (Pls.' Resp. Def.'s Mot. Summ. J. 8).  Plaintiffs assert that "[s]uch statements indicate that [Salman] appear[ed] to act more childish and lackadaisical than a man about to inflict injury on another." (Pls.' Resp. Def.'s Mot. Summ. J. 8).  Even taking Plaintiffs' characterization of Salman's actions as true, Hogan did not shoot Salman in response to Salman's taunts.  Hogan shot Salman only after Salman began making slashing motions with the knife close to Fadaam.  (Hogan Interview 11:01-11:11, 23:27-23:53).  Although Plaintiffs assert that "no statements were given as to how close [Salman's] slashing motions actually were to [Fadaam]," Hogan very clearly indicated that they were "inches" away from Fadaam.  (Hogan Interview 11:01-11:11, 23:27-23:53).

---

[7] Fadaam spoke through a translator during her interview.

Additionally, Plaintiffs assert that "the lack of imminent danger is supported by Ms. Fadaam['s] actions, as she did not flee from Mr. Salman after he was shot, as though in fear of harm." (Pls.' Resp. Def.'s Mot. Summ. J. 8). Plaintiffs' claim is directly refuted by Fadaam's statement that she was scared for her life during this incident and that she was "sure 100%" that Salman would have killed her had the police not arrived and the statements of witnesses who also believed that to be true. (Fadaam Interview 30:45-30:55; 32:50-33:10; Kelly Interview 18:16-18:56; Hart Interview 5:03-5:16; 6:20-6:34; Hogan Interview 11:12-11:28).

Finally, Plaintiffs question "[t]he time taken by . . . Hogan to assess the actual level of threat[.]" (Pls.' Resp. Def.'s Mot. Summ. J. 8-10). Plaintiffs argue that "it is clear that Mr. Salman, a person of limited English, was given very little time, potentially only mere seconds, to comply with the commands to drop his knife by a person who, by his own admission, did not identify himself as police and was not dressed in traditional police uniform or in a marked vehicle." (Pls.' Resp. Def.'s Mot. Summ. J. 9). Again, Plaintiffs fail to acknowledge that Hogan only shot Salman after repeated warnings and was brandishing the knife inches away from Fadaam. (Hogan Interview 11:01-11:11, 23:27-23:53).

The parties attempt to analogize the factual situation of this case to cases supporting their positions. Hogan cites to *Kisela v. Hughes*, 138 S. Ct. 1148 (2018), while Plaintiffs cite to several Sixth Circuit cases. *Kisela* is the most factually analogous case to the case at hand, as outlined by the U.S. Supreme Court:

> Petitioner Andrew Kisela, a police officer in Tucson, Arizona, shot respondent Amy Hughes. Kisela and two other officers had arrived on the scene after hearing a police radio report that a woman was engaging in erratic behavior with a knife. They had been there but a few minutes, perhaps just a minute. When Kisela fired, Hughes was holding a large kitchen knife, had taken steps toward another woman standing nearby, and had refused to drop the knife after at least two commands to do so. The question is whether at the time of the shooting Kisela's actions violated clearly established law.

15

The record, viewed in the light most favorable to Hughes, shows the following.  In May 2010, somebody in Hughes' neighborhood called 911 to report that a woman was hacking a tree with a kitchen knife.  Kisela and another police officer, Alex Garcia, heard about the report over the radio in their patrol car and responded.  A few minutes later the person who had called 911 flagged down the officers; gave them a description of the woman with the knife; and told them the woman had been acting erratically.  About the same time, a third police officer, Lindsay Kunz, arrived on her bicycle.

Garcia spotted a woman, later identified as Sharon Chadwick, standing next to a car in the driveway of a nearby house.  A chain-link fence with a locked gate separated Chadwick from the officers.  The officers then saw another woman, Hughes, emerge from the house carrying a large knife at her side.  Hughes matched the description of the woman who had been seen hacking a tree.  Hughes walked toward Chadwick and stopped no more than six feet from her.

All three officers drew their guns.  At least twice they told Hughes to drop the knife.  Viewing the record in the light most favorable to Hughes, Chadwick said "take it easy" to both Hughes and the officers.  Hughes appeared calm, but she did not acknowledge the officers' presence or drop the knife.  The top bar of the chain-link fence blocked Kisela's line of fire, so he dropped to the ground and shot Hughes four times through the fence.  Then the officers jumped the fence, handcuffed Hughes, and called paramedics, who transported her to a hospital.  There she was treated for non-life-threatening injuries.  Less than a minute had transpired from the moment the officers saw Chadwick to the moment Kisela fired shots.

*Id*. at 1150-51.  The Court in *Kisela* addressed whether Kisela was entitled to qualified immunity

for his use of deadly force, which was resolved in favor of the police officer:

An officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it."  This is a necessary part of the qualified-immunity standard . . . .

Kisela says he shot Hughes because, although the officers themselves were in no apparent danger, he believed she was a threat to Chadwick.  Kisela had mere seconds to assess the potential danger to Chadwick.  He was confronted with a woman who had just been seen hacking a tree with a large kitchen knife and whose behavior was erratic enough to cause a concerned bystander to call 911 and then flag down Kisela and Garcia.  Kisela was separated from Hughes and Chadwick by a chain-link fence; Hughes had moved to within a few feet of Chadwick; and she failed to acknowledge at least two commands to drop the knife.  Those commands were loud enough that Chadwick, who was standing next to Hughes, heard them.

16

> This is far from an obvious case in which any competent officer would have known
> that shooting Hughes to protect Chadwick would violate the Fourth Amendment.

*Id*. at 1152, 1153 (citation omitted).

Like in *Kisela*, Hogan here had "mere seconds to assess the potential danger to" Fadaam. Hogan was also dealing with an individual engaging in erratic behavior, including Salman's threat to kill his wife. As in *Kisela*, Salman was standing close in proximity to Fadaam and did not adhere to Hogan's commands to drop the knife. Hart confirmed "the more [Hogan] told Salman to put the knife down . . . it seemed like [Salman] got more aggressive." (Hart Interview 6:00-6:10). Whether Salman was able to understand Hogan's commands or even knew that Hogan was an officer is seemingly irrelevant—the Court in *Kisela* noted that Hughes "might not have heard [Kisela's] commands" to drop the knife and that Hughes "did not acknowledge the officers' presence or drop the knife." *Kisela*, 138 S. Ct. at 1151, 1153. Most notably, it is undisputed Hogan did not shoot Salman until Salman started making slashing motions inches away from Fadaam's face. (Hogan Interview 11:01-11:28, 23:42-23:53).

Based on the stark similarities between *Kisela* and the case *sub judice*, Hogan is entitled to qualified immunity protecting him from Plaintiffs' Section 1983 excessive force claim. This conclusion is bolstered by key factual differences between this case and the cases relied upon by Plaintiffs. Plaintiffs first cite to *Lopez v. City of Cleveland*, 625 F. App'x 742 (6th Cir. 2015), where the Sixth Circuit reversed the district court's summary judgment for police officers, as it found "contentious factual disputes about the nature of [the decedent]'s movements just before the shooting. Those disputes go to the heart of whether it was reasonable for Defendant Officers to use deadly force." *Id*. at 747. Specifically:

> While Defendant Officers testified that [the decedent] raised the machete and
> turned toward [a bystander], other witnesses described the events differently. [A
> bystander] stated that [decedent] turned toward her with the machete held at his

side, while [one witness] recalled that [the decedent] raised the machete and turned away from [bystander] . . . . [Another witness] stated that [the decedent] never turned in either direction, but remained facing the officers.  Moreover, [other witnesses] each testified that [the decedent] made statements indicating an intent to commit suicide and raised the machete as though intending to harm himself.

. . .

In this case, . . . the parties dispute whether [decedent] made any movement at all toward [the bystander].  Viewing the facts in the light most favorable to Plaintiff, [the decedent] turned his body away from [bystander] as she was moving toward him.  Moreover, there is evidence that he did not raise the machete at all, or raised it in a way that indicated only that he intended to harm himself.  In other words, there is a dispute of fact as to whether Lopez made any movement in those final moments that could reasonably be interpreted as threatening [the bystander]."

*Id*. at 746.  By contrast, in the present case there is no dispute regarding Salman's movements or threatening gesture towards Fadaam before Hogan shot him.  (Hogan Interview 9:47-9:50, 10:30-10:34, 21:08-21:29, 24:02-24:20; Hart Interview 14:53-15:16; Kelly Interview 14:22-14:45, 15:32-15:35).

Plaintiffs' reliance on *Chappell v. City of Cleveland*, 585 F.3d 901 (6th Cir. 2009), and *Scozzari v. Miedzianowski*, 454 F. App'x 455 (6th Cir. 2012), is similarly unavailing.  Plaintiffs rely on dicta in *Chappell*, i.e., a hypothetical situation posited by the Sixth Circuit that "[if] the detectives had fired immediately upon finding [decedent] hiding in the closet with a knife, their actions would certainly be held objectively unreasonable."  *Chappell*, 585 F.3d at 915.  Plaintiffs suggest that the purported similarly short time period between Hogan arriving at the scene and shooting of Salman renders Hogan's actions objectively unreasonable.  (Pls.' Resp. Def.'s Mot. Summ. J. 9).  The hypothetical posited in *Chappell* is markedly different from the situation in the case at hand—Hogan did not come upon Salman hiding in a closet with a knife with no victim in sight.  Instead, Salman was standing within arm's length of the potential victim and was shot only after making threatening motions toward the victim with a weapon.

Plaintiffs' comparison to *Scozzari* is similarly unavailing, as the Sixth Circuit in *Scozzari* found significant factual disputes:

> Viewed in the light most favorable to Plaintiff, the evidence indicates that the Officers were standing 15 to 20 feet from Scozzari when they shot him. Further, Scozzari was 51 years old, 5'3' and 133 pounds, blind in one eye and hardly physically intimidating. Additionally, there are genuine issues of material fact whether Scozzari was wielding a knife and hatchet over his head. Further, there is evidence that Scozzari was moving slowly. According to [an officer], Scozzari walked or took "a couple steps" in [another officer's] direction; other witnesses recalled Scozzari moving slowly or not at all. . . . [T]he circumstances here present a genuine question whether the situation compelled a split-second decision to use lethal force.

*Scozzari*, 454 F. App'x at 463 (citation omitted). A key difference between the case at hand and *Scozzari* (as well as *Chappell*) is that the Hogan was protecting a bystander while the officers in *Scozzari* and *Chappell* were protecting themselves. *Chappell*, 585 F.3d at 915; *Scozzari*, 454 F. App'x at 457-58. The fact that the only physical danger was to the officers is presumably why the Sixth Circuit referenced Scozzari's diminutive stature. Also in *Scozzari*, there was a dispute regarding Scozzari's weapon and whether he was moving toward the officers, in stark contrast to the present case where it is undisputed that Salman was standing close to Fadaam, making menacing gestures toward Fadaam with his knife. (Hart Interview 6:00-6:10; Hogan Interview 11:01-11:11, 23:27-23:53).

In conclusion, the U.S. Supreme Court's decision in *Kisela* is closely on point with the factual circumstances in the case at hand, and Plaintiffs' comparisons to other cases is unavailing. In this instance, Hogan is protected by qualified immunity as a matter of law on Plaintiffs' Section 1983 excessive force claims and his actions were not unreasonable. The Court will therefore grant summary judgment in Hogan's favor on Count I of Plaintiffs' Complaint, and Plaintiffs Section 1983 excessive force claim in that regard will be dismissed with prejudice. *See Rivera v. PNS Stores, Inc.*, 647 F.3d 188, 194 (5th Cir. 2011) (dismissing claim with prejudice on motion for

19

summary judgment after recognizing that "[s]ummary judgment . . . is the procedural equivalent of a trial and is an adjudication of the claim on the merits."  (citation omitted)).

### B.   State Law Claims

Hogan argues that he is entitled to qualified immunity on Plaintiff's state law claims, as well.  While federal law determines whether Hogan is immune from federal law claims, state law determines whether Hogan is immune from state law claims.  *Funke v. Coogle*, No. 3:11-CV-310-H, 2013 WL 209602, at *2 (W.D. Ky. Jan. 17, 2013) (citations omitted); *see also Jefferson Cty. Fiscal Court v. Peerce*, 132 S.W.3d 824, 836 (Ky. 2004).  The parties agree that Kentucky state law forms the substantive law governing Frazier's state law claims.  (Def.'s Mem. Supp. Mot. Summ. J. 8-15; Pls.' Resp. Def.'s Mot. Summ. J. 12-14, DN 18-1).

The Sixth Circuit in *Reich v. City of Elizabethtown*, 945 F.3d 968 (6th Cir. 2019), dealt with the application of Kentucky's qualified immunity doctrine to state law claims for battery, wrongful death, negligence, and intentional and negligent infliction of emotional distress, stemming from police officers' shooting of an individual wielding a knife and refusing to accede to officers' commands to drop the weapon:

> Under Kentucky law, qualified immunity protects a police officer so long as he performed "(1) discretionary acts or functions . . . ; (2) in good faith; and (3) within the scope of [his] authority."  This doctrine applies to negligence actions and intentional torts.  The determination of the amount of force required, including the decision to use deadly force, is a discretionary act.
>
> And the use of deadly force plainly falls within the scope of a police officer's authority.  Because the officers performed discretionary acts within their authority, the burden shifts to [the plaintiff] "to establish by direct or circumstantial evidence that the discretionary act[s] w[ere] not performed in good faith."
>
> That leaves us with the question whether the officers acted in good faith.  This inquiry, adopted from the Supreme Court's decision in *Harlow*, has both an objective and subjective component.  Objectively, a court must ask whether the officer's conduct demonstrates "a presumptive knowledge of and respect for basic, unquestioned constitutional rights."  Subjectively, courts ask whether the official

20

> behaved with "permissible intentions."  Thus, [the plaintiff] can show bad faith by
> pointing to (1) "a violation of a constitutional, statutory, or other clearly established
> right which a person in the public employee's position presumptively would have
> known was afforded a person in [the decedent's] position" or (2) evidence that an
> officer "willfully or maliciously intended to harm [the decedent] or acted with a
> corrupt motive."

*Id*. at 982-83 (internal citations omitted) (citations omitted).  After finding the officer in *Reich* to

be entitled to qualified immunity on the plaintiff's Section 1983 Fourth Amendment excessive

force claim, the Court found that its "analysis of [the plaintiff's Section 1983] Fourth Amendment

claim takes care of prong one—the officers did not violate [the decedent's] constitutional right to

be free from excessive force and, even if they did, the unlawfulness of the officers' conduct was

not clearly established at the time." *Id*. at 983.  As for prong two, the Court's "independent review

of the record turned up no facts to support a finding of bad faith." *Id.*  The Court concluded that

"[f]or that reason, [the plaintiff]'s claims of negligence, negligent infliction of emotional distress,

and wrongful death fail.  So too her common law battery claim.  Same goes for her outrage and

intentional infliction of emotional distress claims." *Id*. (citations omitted).

Following the instruction of *Reich*, Hogan is entitled to qualified immunity to shield him

from all of Plaintiffs' state law claims.  For the reasons outlined in the previous section, there is

no evidence of bad faith on the part of Hogan in shooting Salman, Hogan's actions were

reasonable, and the unlawfulness of his actions was not clearly established at the time of the

shooting.  Summary judgment will therefore be granted in Hogan's favor on Plaintiffs' claims

under Count IV, V, and VI of the Complaint and will be dismissed with prejudice.

As a final matter, Plaintiffs include a separate count for punitive damages in their

Complaint.  (Compl. ¶¶ 118-119).  However, "a claim for punitive damages is not a separate cause

of action, but a remedy potentially available for another cause of action." *Dalton v. Animas Corp.*,

913 F. Supp. 2d 370, 378-79 (W.D. Ky. 2012) (citations omitted).  In other words, there is no such

thing as a "claim" for punitive damages.  To the extent that Plaintiffs purport to assert a claim for punitive damages in Count VIII, summary judgment is granted in Hogan's favor and that claim is dismissed with prejudice.

### C.    Plaintiffs' Objection to Magistrate Judge's Discovery Ruling

At the same time that Plaintiffs filed their response to Hogan's motion for summary judgment, Plaintiffs filed a motion for an extension of time to respond to Hogan's interrogatories, requests for production of documents, and requests for admissions, which the Magistrate Judge denied.  (Pls.' Mot. Extension Time 1, DN 19; Order 3, DN 27).  Plaintiffs have since objected to that denial.  (Pls.' Obj. 1-3); *see* Fed. R. Civ. P. 72(a) ("When a pretrial matter not dispositive of a party's claim or defense is referred to a magistrate judge to hear and decide, the magistrate judge must promptly conduct the required proceedings and, when appropriate, issue a written order stating the decision.  A party may serve and file objections to the order within 14 days after being served with a copy. . . . The district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law.").

Hogan tendered his discovery requests on November 13, 2019.  (Pls.' Obj. 2).  Plaintiffs admit that their responses to Hogan's discovery requests were due by December 13, 2019.  (Pls.' Obj. 2).  Plaintiffs' only argument for not responding to Hogan's discovery requests in a timely manner was summarized by the Magistrate Judge:

> [B]ecause Plaintiffs' responses required translation from Arabic to English and Plaintiffs' counsel was involved in a murder trial in state court from December 11 to 18, 2019, the Motion explains that the failure to timely file Plaintiffs' responses "was due [] entirely to inadvertence or neglect on the part of Plaintiffs' counsel." That notwithstanding, Plaintiffs reason that because discovery is in its infancy, the requested extension will not result in prejudice.

(Order 1-2).  The Magistrate Judge found that Plaintiffs did not meet the standard for excusable neglect under Fed. R. Civ. P. 6(b).  (Order 2-3); *see also Nafziger v. McDermott Intern., Inc.*, 467

F.3d 514, 522 (6th Cir. 2006) ("[T]he governing legal standard for excusable-neglect determinations is a balancing of five principal factors:  (1) the danger of prejudice to the nonmoving party, (2) the length of the delay and its potential impact on judicial proceedings, (3) the reason for the delay, (4) whether the delay was within the reasonable control of the moving party, and (5) whether the late-filing party acted in good faith." (citing *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993)).

The Magistrate Judge found "inexcusable" the two-month delay between the response deadline and Plaintiffs' request for an extension.  (Order 3).  This Court does, as well.  Plaintiffs' delay in moving for an extension of time is not explained by a week-long trial.  Plaintiffs' counsel waited until almost two months after the conclusion of the murder trial to file a motion for extension of time, and even then sought extension more than three weeks after Defendants moved for summary judgment.  (Defs.' Mot. Summ. J., DN 16; Pls.' Mot. Extension Time, DN 19).  The Magistrate Judge properly found that this delay was within the reasonable control of Plaintiffs and that there is nothing to support a finding that Plaintiffs acted in good faith.  (Order 3).  Finally, although Plaintiffs' counsel attempt to fall on their sword on behalf of their clients, "a client may be made to suffer the consequence[s] . . . of its attorney's failure[s] . . . ."  *Pioneer*, 507 at 396 (citing *Link v. Wabash R.R. Co.*, 370 U.S. 626 (1962)).

Most importantly, Plaintiffs' request for an extension stems from the effect of failing to respond to Defendants' requests for admission, i.e., that requests not denied are deemed admitted. (Pls.' Obj. 2-3).  As outlined extensively in this Court's opinion, however, the Court has not relied on Fadaam's failure to respond to any of Hogan's discovery requests in any way in adjudicating this case—Hogan's requests for admission played no part in the Court's decision in this case. Rather, the Court relied entirely on the sworn statements of the parties and witnesses.  Plaintiffs

have not explained what further value Fadaam's discovery responses would have when Fadaam's sworn statement, taken the day of the incident, is already in the record.  There has been no attempt by Plaintiffs to show the existence of any evidence to contradict the statements in the record or how additional discovery could bear on the facts outlined above.

For these reasons and the reasons outlined in the Magistrate Judge's well-reasoned order, Plaintiffs' objections to the Magistrate Judge's denial of their extension of time to file responses to Hogan's discovery requests will be overruled.

## V.    <u>CONCLUSION</u>

For the reasons set forth above, **IT IS HEREBY ORDERED** that:

1.    Plaintiffs' Objection to the Magistrate Judge's Discovery Ruling (DN 28) is **OVERRULED.**

2.    Defendant Brandon Hogan's Motion for Summary Judgment (DN 16) is **GRANTED**.  All of Plaintiffs' claims against Defendant Brandon Hogan are **DISMISSED WITH PREJUDICE**.  The Clerk is directed to strike this matter from the active docket.

Greg N. Stivers, Chief Judge

United States District Court

April 30, 2020

cc:    counsel of record

24